# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# LYNCHBURG DIVISION

| | |
|---|---|
| **HENRY T. ROARK**, ) | |
| ) | |
| Plaintiff, ) | Case No. 6:05CV00041 |
| ) | |
| v. ) | **OPINION** |
| ) | |
| **UNITED STATES OF AMERICA,** ) | By: James P. Jones |
| ) | Chief United States District Judge |
| Defendant. ) | |

*Joseph A. Sanzone, Sanzone & Baker, P.C., Lynchburg, Virginia for Plaintiff; Thomas L. Eckert, Assistant United States Attorney, Roanoke, Virginia, for Defendant.*

The plaintiff, Henry T. Roark, was injured in an automobile accident on November 12, 2003, in Lynchburg, Virginia. The accident occurred when Roark's vehicle was rear-ended on the on-ramp of an expressway in Lynchburg, Virginia, by a car that had in turn been rear-ended by a vehicle driven by an FBI agent. Roark filed the present action against the United States pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C.A. §§ 2671-2680 (West 1994 & Supp. 2006), claiming damages caused by the negligence of the FBI agent. Jurisdiction of this court exists pursuant to 28 U.S.C.A. § 1346(b)(1) (West 1993 & Supp. 2006).

On a motion for partial summary judgment by Roark, the court previously held that the accident resulted from the negligence of the government employee, leaving

for trial only the issue of damages. A bench trial on this issue was held on September 8, 2006, and the matter is now ripe for decision. As required by Federal Rule of Civil Procedure 52(a), the following constitute my findings of fact and conclusions of law.

I

At the time of the accident, Roark was employed as an assembly mechanic with Forestry Equipment of Virginia, Inc. ("Forestry Equipment"). Roark is presently thirty-nine years old and quit high school in the tenth grade. Prior to his employment with Forestry Equipment, he worked in several other fields, but as he testified at trial, he has never held a job that did not involve some form of manual labor.

Roark first began working for Forestry Equipment in 1997. As Roark reported at trial, the company taught him everything he needed to perform the job. He worked his way up through the company and at the time of the accident was making thirteen dollars and fourteen cents per hour. Additionally, while working for Forestry Equipment, the plaintiff received benefits such as the company's contribution to a

health care plan for his family and paid vacation days.[1]  As he and his wife testified, at the time of this accident, he was the primary wage earner in his family.[2]

Following the automobile accident on November 12, 2003, Roark was strapped to a stretcher and taken by ambulance to Lynchburg General Hospital.  While at the hospital, he was given a neck brace, a prescription for medicine, and was told to go see a specialist.

On November 19, 2003, Roark saw Michael G. Browne, M.D., an orthopedic specialist. When examined by Dr. Browne, Roark complained of pain in his right shoulder.  As Dr. Browne stated in his deposition, during this visit he prescribed several medications to Roark for his acute symptoms and recommended that he get an MRI to evaluate the disks of his neck.

 The MRI was performed on December 2, 2003.  As Dr. Browne reported in his deposition, the MRI revealed a disk herniation which was consistent with Roark's previous examination.  In a follow-up visit with Roark on December 8, 2003, Dr.

---

[1]  While Roark does not request compensation for lost overtime hours, he did testify at trial that prior to the accident, he worked all of the overtime hours that were available at his company which was usually about eight to ten hours a week.  As Roark reported, he was paid time and a half for these overtime hours.

[2]  At the time of the accident, Roark's stepchildren were living with him and his wife.  As he reported at trial, his health insurance plan also covered these stepchildren.

Browne recommended that Roark be evaluated by a neurosurgeon and referred him to Shawn B. Clark, M.D., for continued treatment.

In his first visit with Roark in December 2003, Dr. Clark initially attempted to help Roark's condition through non-surgical methods. As Dr. Clark reported in his deposition, these methods included: a cervical epidural injection, physical therapy, and a prescription for an oral steroid pack. Roark next visited Dr. Clark on January 13, 2004 and it was during this visit that Dr. Clark learned that the epidural shot had not worked as Roark continued to have pain in his right arm to the first, second, and third fingers especially when he moved his head or his neck. Between his first and second visit with Dr. Clark, Roark had also begun attending physical therapy sessions which, as he reported to Dr. Clark, had helped him a little.[3] Thus, it was during this follow-up visit in January 2004, that Dr. Clark offered Roark the option of having cervical discectomy surgery.

The cervical discectomy surgery was performed on January 28, 2004. As he testified at trial, when Roark awoke from the surgery he was painfully choking for

---

[3] Roark saw Stephen M. Scott, a physical therapist, beginning in December 2003 and up through May 2004. As Scott testified in his deposition, Roark had to end treatment in May 2004 because he lacked the financial capacity to pay and his insurance only allowed him two thousand dollars' worth of therapy a year. However, as Scott also reported, he had been planning to discharge Roark from physical therapy soon anyway and was hoping to transfer him to a home exercise program.

several minutes. After being discharged from the hospital following the surgery, Roark still had problems moving his neck. His wife stated at trial that for several weeks following the surgery, he had problems getting out of bed on his own and needed her to help lift him out of bed. Due to his continued pain in his neck and shoulder, the neurosurgeon recommended that he see Murray E. Joiner, Jr., M.D., for pain management. Dr. Joiner prescribed anti-inflammatory medications. At the time of trial, Roark was no longer taking these medications, since he could not afford to pay for any of the medications that had been prescribed to him.[4]

Between January 2004 and July 2005, Roark was also treated by James Gallagher, M.D., a psychiatrist. As Dr. Gallagher testified at trial, he diagnosed Roark as suffering from major depression, single episode, severe. During his sessions with Roark, Dr. Gallagher found that Roark was extremely anxious. Dr. Gallagher opined that the anxiousness may have partially stemmed from the economic stress Roark was under. Dr. Gallagher also reported that Roark appeared very upset about not being able to work and provide for his family. As Dr. Gallagher stated, Roark no longer defined himself as a useful member of society.

---

[4] After losing his job with Forestry Equipment, Roark tried to pay for his health insurance on his own, but eventually had to end the policy due to financial constraints. Additionally, while the government suggested that Roark could have applied for Medicaid to continue receiving his medication, as Roark reported at trial, he did not qualify for Medicaid as he owns his own home.

In fact, Roark was never able to return to his job with Forestry Equipment following the accident. The company gave him twelve weeks to return to work and as Roark testified at trial, he was unable to meet that deadline because of his surgery. Furthermore, when his injuries had improved to the point that he felt comfortable re-entering the workplace, his injury limited his employment opportunities, since he had problems moving his neck and lifting more than a minimal weight.

Roark did find employment in 2005 pumping gas. His first such job was at an Exxon service station where he made six dollars per hour. He left Exxon to take a job with another gas station because he would be making more money there. As he testified, he wanted to make as much money as possibly for the kind of work he was now capable of doing. At his second job, he began at six dollars and forty-five cents an hour and worked his way up to seven dollars an hour.

Roark lost his second gas pumping job because he requested time off to see a doctor and was informed by his boss that if he took time off, he should not come back at all. Since losing his second gas pumping job, the plaintiff has applied for jobs in other areas such as cleaning carpets but has never heard back from a prospective employer. When applying for these jobs, Roark had to disclose his neck injury, since the applications required him to put down why he had left his previous jobs.

Meanwhile, Roark applied for social security disability benefits, but his application was denied.

In addition to the physical and mental problems associated with Roark's injuries, the accident has taken a toll on Roark's marriage. Mrs. Roark testified that since the accident, her marriage has gone downhill partially due to Roark's depression and the financial difficulties they have experienced. As she stated, she has left the plaintiff a couple of times, once for a period of several months.

II

The FTCA is a waiver by the United States of its immunity from suit. Pursuant to the FTCA, the United States is liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C.A. § 2674 (West 1994 & Supp. 2006). Consequently, damages generally are determined under the law of the state where the act or omission occurs, in this case Virginia. In determining an award of damages, Virginia law permits consideration by the trier of fact of (1) any bodily injuries the plaintiff sustained and their effect on his health according to their degree and probable duration; (2) any physical pain and mental anguish he suffered in the past and any that he may be reasonably expected to suffer in the future; (3) any inconvenience caused in the past and any that probably will be caused in the future;

(5) any medical expenses incurred in the past; (6) any earnings he lost because he was unable to work at his calling; (7) any loss of earnings and lessening of earning capacity, or either, that he may reasonably be expected to sustain in the future; and (8) any property damage he sustained. *See* 1 Model Jury Inst. Comm., *Virginia Model Jury Instructions, Civil*, Inst. No. 9.000 (2006).

There is no requirement that the plaintiff show the exact amount of damages with absolute certainty; however, a plaintiff must prove with reasonable certainty the amount of his damages and the cause of his injury or loss. *Medcom, Inc. v. C. Arthur Weaver Co.*, 348 S.E.2d 243, 248 (Va. 1986). "Damages which cannot be established with reasonable certainty are speculative or conjectural and may not be recovered." *Miller v. Johnson*, 343 S.E.2d 301, 307 (Va. 1986). In short, "[p]roof with mathematical precision is not required, but there must be at least sufficient evidence to permit an intelligent and probable estimate of the amount of damage." *Hailes v. Gonzales*, 151 S.E.2d 388, 390 (Va. 1966).

Additionally, an injured party has an obligation to mitigate damages. *See Forbes v. Rapp*, 611 S.E.2d 592, 595 (Va. 2005). "Where an injured party finds that a wrong has been perpetrated on him, he should use all reasonable means to arrest the loss. . . . It is only incumbent upon him, however, to use reasonable exertion and

reasonable expense. . . ." *Haywood v. Massie*, 49 S.E.2d 281, 284 (Va. 1948) (internal quotation omitted).

III

In determining the proper amount of damages, I first note the parties' stipulation that the plaintiff's medical expenses amounted to $49,032.23 and his related travel expenses were $530.40. Additionally, the parties stipulated that Roark's personal property damage amounted to $5,855.38. Moreover, the government does not dispute that Roark's neck injury resulted solely from the accident, or that he is unable to return to his former job because of his injury and resulting disability. Thus, the only issues left for me to resolve is the amount the plaintiff is entitled to recover for loss of earning capacity, both past and future, and mental and physical pain and suffering.

Regarding past wage loss, the court heard conflicting testimony from two experts: Norman Fayne Edwards and Richard Edelman. Roark's expert, Dr. Edwards, a retired professor of economics from the University of Richmond, testified that Roark's lost wages from the time of the accident until the time of the trial amounted to $66,529. In contrast, Dr. Edelman, who testified on behalf of the government and who is a professor emeritus of economics at American University,

opined that Roark's past lost wages amounted to $87,057. As Dr. Edelman reported at trial, his figure differed from Dr. Edward's for two reasons. First, when determining lost wages, Dr. Edelman took into account Forestry Equipment's contribution to Roark's health insurance and any other fringe benefits. As Dr. Edelman emphasized, it was appropriate for economists to consider fringe benefits when calculating lost wages. Second, the two economics experts differed in that when calculating wage growth, Dr. Edelman used a higher rate than Dr. Edwards had used in his own calculations. While Dr. Edwards used the national average rate of wage growth, Dr. Edelman used the average rate for skilled blue-collar workers specifically, which is slightly higher than the average rate for all workers. In short, Dr. Edelman used a number that was tailored to the type of work Roark had once performed. In short, finding Dr. Edelman's calculation of past lost wages more reasonable, I will fix the amount of Roark's past lost wages at $87,057.

On the issue of loss of future wages, I was presented with conflicting testimony from occupational experts regarding Roark's future employment opportunities. The government argued that Roark has an obligation to mitigate his damages by returning to work. In particular, the government suggested that Roark could become a truck driver which pays more than the gas pumping jobs he has had since the accident. Roark contended that while he wants to return to work, he has had problems finding

work since the accident. As he further argued, because of his neck injury, he likely will be limited to jobs that pay similarly to what he made pumping gas. Hence, the crucial issue explored at trial was whether based on Roark's past work experience and his injury, he is capable of acquiring a higher paying job such as a commercial truck driver.

Roark's first occupational expert was Donald G. Branson, M.D., a physician with a background in occupational medicine, who often performs disability determinations.[5] Dr. Branson examined Roark on July 7, 2004, after Roark had been referred to Dr. Branson by Dr. Clark for a disability determination. Dr. Branson opined that Roark could possibly work in a sedentary job which would require lifting of no more than ten pounds. Additionally, Dr. Branson stated at trial that if a job required a physical exam, it was unlikely that Roark would pass it and, hence, Roark could not perform competitive work. In particular, Dr. Branson felt that Roark could not pass the examination that is a prerequisite to becoming a truck driver. Dr.

---

[5] Dr. Branson is not board certified in the specialty area of occupational medicine. As he testified at trial, he had originally intended to become board certified and took several of the relevant courses, but after failing the exam, he decided not to pursue the certification process further as he was still able to operate an occupational medicine practice. When I asked Dr. Branson what the purpose or nature of his care and examinations were, he responded, "to determine the suitability and safety for employment." Thus, I allowed Dr. Branson to testify in this case despite his lack of certification in occupational medicine after finding that Dr. Branson is capable of expressing an opinion that may be helpful to the trier of fact in determining the issues in this case.

-11-

Branson, who has conducted such exams, testified that he did not believe Roark could become a truck driver because of his lifting restrictions, his pain, his apparent inability to concentrate likely stemming from his depression, and his neck movement limitations.

Likewise, Larry L. Sinsabaugh, Ph.D., a rehabilitation expert called by Roark, opined that Roark was not capable of working as a truck driver. As Dr. Sinsabaugh noted, he took several factors into consideration when concluding that Roark was neither suitable nor qualified for a truck driving position. In particular, he relied on Dr. Clark's and Dr. Branson's reports regarding Roark's lifting restrictions. Furthermore, Dr. Sinsabaugh emphasized in his testimony that even if Roark received a job that did not require him to lift his cargo, he would be required to maintain the upkeep of his truck, a task that his injury prevented him from performing. Additionally, Dr. Sinsabaugh's conclusion that Roark was not suited to be a driver relied on Roark's pain and range of motion limitations, the fact that he does not have a commercial driver's license, and his several speeding tickets. As Dr. Sinsabaugh stated, Roark is not a very competitive candidate because of this blemished driving record. Finally, Dr. Sinsabaugh pointed to the list of medications that Roark should be taking, which could prevent him from performing certain other higher paying jobs such as a night watchman position.

The government presented the testimony of two occupational experts: Phillip Bussey, Ph.D., an expert in the fields of rehabilitation and vocational counseling, and Darrell Powledge, M.D., an occupational medicine physician. Dr. Bussey, who has a doctorate in rehabilitation counseling and runs a rehabilitation counseling business, stated that Roark could become a school bus driver or a forklift driver with some rehabilitation. He suggested that Roark undergo both medical rehabilitation (physical therapy and medications) and vocational rehabilitation. With respect to vocational rehabilitation, Dr. Bussey recommended that Roark work towards getting his GED and either train for a commercial driver's license or take courses at a community college relating to forklift operation. As Dr. Bussey testified, such vocational training could also teach Roark how to sell himself to employers so that they would hire him despite his neck injury.[6] According to Dr. Bussey, this two pronged rehabilitation would cost about five thousand dollars and take between six and eight months.

The defense's other vocational expert, Dr. Powledge, similarly opined in his deposition that Roark could pass the physical exam for a commercial driver's license. Yet, Dr. Powledge, who is an occupational medicine physician, also stated that

---

[6] During the trial, I asked this expert whether in his experience, a person who has suffered a severe neck or back injury is prejudiced in obtaining manual labor jobs. In his response, Dr. Bussey admitted that some prejudice is possible and that one of the reasons Roark needs the vocational training is so that he can be taught how to sell himself to employers and overcome any possible prejudice.

-13-

presently Roark's injuries prevent him from being a long haul driver and from lifting and unloading a truck. Dr. Powledge additionally testified that he did not believe that Roark had reached maximum medical improvement. Thus, Dr. Powledge suggested that if Roark resumed taking the inflammatory medicine that had been prescribed to him by Dr. Joiner and restarted his physical therapy, his injuries would improve to the point that he would get his range of motion back, could drive long distances, and could lift and unload a truck.[7]

However, after reviewing all of the evidence regarding Roark's future employment possibilities, I find that the government has failed to prove that Roark is capable of becoming a truck driver. The evidence presented by the government in this regard is too speculative to be taken into account when fixing Roark's award for future wage loss. Roark currently does not have a commercial driver's license, he has no experience as a truck driver, he has an imperfect driving record which could prevent him from being hired, and as several witnesses testified, his injuries prevent him from performing tasks ordinarily required of a truck driver. Even the government's two vocational experts, the only witnesses who felt Roark could be a

---

[7] More specifically, on the issue of Roark's lifting restrictions, Dr. Powledge testified in his deposition that while Roark was currently at a light to light medium lifting level, with treatment he could get up to medium level.

-14-

truck driver, admitted that Roark would need to undergo additional rehabilitation before he could attain such a job.

In short, while Roark has an obligation to mitigate his damages by trying to attain a new job, I find that the type of job that he is capable of performing would have a starting salary of approximately seven dollars and fifty cents an hour. As Dr. Edelman testified, if Roark returns to work and begins at a rate of seven dollars and fifty cents an hour, the present value of his future loss is $408,562. Thus, I fix Roark's loss of future earning capacity at this amount.[8]

In addition to the medical expenses, property damages, and economic losses, I will add $100,000 for the physical pain, mental anguish, and inconvenience suffered by Roark as a result of the accident. After observing the plaintiff at trial, I find him fully credible and not exaggerating the results of his injury. For a long period

---

[8] While under Virginia law, a defendant in a tort case is not entitled to a reduction in an award of future lost wages to reflect the income taxes that would have been paid on the earnings, such a reduction for federal income taxes is approved in FTCA cases. As stated by the Fourth Circuit in *Flannery v. United States*, 718 F.2d 108, 111 (4th Cir. 1983), "it has now been repeatedly held that federal income taxes must be deducted in computing lost future earnings, notwithstanding the fact that such deductions are not permitted under state law." However,"the burden is on the government to raise the issue and to prove the extent of the reduction." *Musick v. United States*, 781 F. Supp. 445, 453 (W.D. Va. 1991); see also *Jovanovich v. United States*, 813 F.2d 1035, 1037 (9th Cir. 1987); *Barnes v. United States*, 685 F.2d 66, 69 (3d Cir. 1982); *United States v. Cline*, 410 F.2d 1337, 1343 (9th Cir. 1969). Because the government has not raised the issue in this case, a reduction in future lost earnings for federal income taxes will not be applied.

following the accident, Roark was in severe pain and was unable to move his neck normally.  As previously mentioned, Roark had to undergo surgery from which he awoke screaming in pain and choking.  Furthermore, since the surgery, Roark has continued to have pain and problems moving his neck.

Additionally, since the accident Roark has experienced significant emotional distress.  As Dr. Gallagher, Roark, and Roark's wife all testified to, Roark began to suffer from depression following the accident.  In particular, he has been very distraught over losing his job with Forestry Equipment and has stated that he no longer feels like a useful member of society.  Dr. Gallagher also noted that during treatment, Roark appeared extremely anxious, likely because of the significant economic stress Roark has been under since losing his job.

IV

For these reasons, I find that the plaintiff has suffered damages proximately caused by the accident in the amount of $651, 037.01.  A separate judgment will be entered.

DATED: October 13, 2006

/s/ JAMES P. JONES
Chief United States District Judge